IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Paul L. Phelps, Jerry H. Gilstrap,       )
Jerry W. Cuddy, Gerald W. Lyda,          )
Nina Posey, Thomas R. Williams,          )          CA No. 6:02-3739-HMH
Alvin A. Stiwinter, Troy J. Cottrell,    )
Thomas L. Carolson, Robert W. Carter,    )          **OPINION & ORDER**
Wayne F. McWhorter, Rodney K.            )
Deanhardt, Sr., Melvin M. Brock, Edward  )
J. Cooley, Charles A. Furr, Francis C.   )
Aiken, Elizabeth Audrey Loredo, Jimmy    )
S. Staton, Norman Davis, Eugene M.       )
Krenek, Richard N. Ryder, II, and        )
Katherine D. Lackey,                     )
                                         )
              Plaintiffs,                )
                                         )
       vs.                               )
                                         )
Cliff Theisen, C.T. Enterprises, Inc.,   )
Saco Lowell, Inc., Tom Pomian, Mike      )
Templeton, and Branch Banking and        )
Trust of South Carolina,                 )
                                         )
              Defendants.                )

This matter is before the court on the parties' cross motions for summary judgment.[1]

On January 12, 2004, this court previously decided cross-motions for summary judgment filed

by the parties, whereby the court granted Defendants C.T. Enterprises, Inc. ("C.T.") and Saco

Lowell, Inc.'s ("Saco Lowell") motion for summary judgment and denied Plaintiffs' motion

---

[1] On June 11, 2003, Branch Banking and Trust of South Carolina ("BB&T") was voluntarily dismissed. On April 15, 2005, Cliff Theisen, Tom Pomian, and Mike Templeton were dismissed with prejudice. Therefore, only C.T. Enterprises, Inc. and Saco Lowell, Inc. remain as defendants in the case.

1

for summary judgment.  The parties appealed from that judgment and the United States Court

of Appeals for the Fourth Circuit vacated and remanded, finding that disputed issues of

material fact existed as to Plaintiffs' claims for breach of fiduciary duty under the Employee

Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C.A. §§ 1001 et seq. (West 1999

& Supp. 2005).  Specifically, the court of appeals stated that a "reasonable fact finder could

find that C.T." was a fiduciary "under ERISA when . . . [it] directed that the Employees' own

paycheck contributions, which were then due for payment by the Claims Administrator

(Kanawha) to third parties under the provisions of the Plan, be diverted instead for other

purposes."  Phelps v. C.T. Enters., 394 F.3d 213, 221 (4th Cir. 2005).  The court in Phelps

also stated that "[a]fter proper consideration of [whether] . . . [C.T.] failed to remit the

Employees' own paycheck contributions to the Claims Administrator, the district court may

find that a different resolution of the incomplete disclosure allegation . . . is appropriate on

these facts."  Id.

On remand, the parties conducted additional discovery and filed the instant cross-

motions for summary judgment.  After thorough consideration of the parties' arguments, the

pleadings and evidence submitted in support thereof, and the applicable law, Plaintiffs' motion

for summary judgment is denied and Defendants' motion for summary judgment is granted in

part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves a Group Health Benefits Plan ("Plan") governed by ERISA.  Saco

Lowell, a wholly owned subsidiary of C.T., originally issued the Plan, effective April 5, 1999,

for its employees.  (Pls.' Mem. Supp. Summ. J. Ex. 28 (Plan Document at 75); Defs. Mot.

2

Summ. J. Ex. 8 (Deposition of Clifford Theisen (hereinafter "Theisen Depo.") at 10 lines 11-13).)  Saco Lowell, in addition to being the Employer, also served as the Plan Sponsor and Plan Administrator.  (Pls.' Mem. Supp. Summ. J. filed Nov. 24, 2003 Ex. 1 (Plan Document at 74).)  The Plan was later amended, effective July 1, 2000, to substitute C.T. as the Employer and Plan Administrator.  (Id. Ex. 2 (Amendment No. 3 to Plan Document at 1).)

"The benefits under [the] Plan [we]re paid for by [Defendants] and [their] Employees." (Pls.' Mem. Supp. Summ. J. Ex. 28 (Plan Document at 75); Pls.' Mem. Supp. Summ. J. filed Nov. 24, 2003 Ex. 2 (Amendment No. 3 to Plan Document at 3).)  Participating employees contributed either $1, $17, or $21 weekly on a pre-tax basis.  Defendants withheld these contributions from the employees' paychecks in Saco Lowell's general account until the contributions were transferred to Kanawha HealthCare Solutions, Inc. ("Kanawha"), the third-party claims administrator, for payment of claims.  (Defs.' Mem. Supp. Summ. J. Ex. 1 (Affidavit of Clifford Theisen (hereinafter "Theisen Aff.") ¶ 5); Ex. 3 (Affidavit of Michael C. Templeton (hereinafter "Templeton Aff.") ¶ 6).)

Generally, Defendants transferred the precise amount of funds necessary to pay outstanding claims to Kanawha on a weekly basis, and these amounts routinely exceeded the employees' contributions to the Plan.  In mid-July 2000, however, due to financial difficulties at Saco Lowell, Defendants failed to provide Kanawha with sufficient funds to pay timely all outstanding claims due under the Plan.   (Id. Ex. 1 (Theisen Aff. ¶¶ 5-6); id. Ex. 3 (Templeton Aff. ¶¶ 5-7, 13).)

Michael C. Templeton ("Templeton"), comptroller for Saco Lowell and an officer of C.T., testified in his deposition that, after the middle of July 2000, "the bank told [Saco

Lowell] that they weren't going to continue to fund [it] and [Saco Lowell] ran out of money for payroll." (Pls.' Mem. Supp. Summ. J. Ex. 26 (Deposition of Michael C. Templeton (hereinafter "Templeton Depo.") at 17 lines 17-20).) In addition, "three employees or spouses . . . had . . . heart attacks and strokes all within one short period of time and . . . Kanawha did not want us to pay partial. They wanted the whole thing or nothing and . . . we didn't have seventy-four thousand dollars . . . ." (Id. Ex. 26 at 17 line 23-18 line 3.) When asked, "[a]t that point, . . . [w]ho made the decision not to divert money in to pay those health claims but to divert to pay other things," Templeton answered,

> I am not sure a conscious decision was made to do that. Like I said, at that time Kanawha only wanted the whole payment. They did not want to go in it and pull out, you know, we'll pay you half this week, half of it next week, and you release half the checks and half the checks. They didn't want to do that. So it came down to paying payroll or paying the health claims.

(Id. Ex. 26 at 18 lines 8-21.)

Sometime in August 2000, Cliff Theisen ("Theisen"), Chief Executive Officer of Saco Lowell and C.T., met with employees to inform them generally of the Plan's financial problems. Theisen remembered telling employees that the company was not "meeting all [its] obligations" with respect to the Plan and "that the bank was controlling the purse strings [of the company]," but "hopefully, [the company] would be able to resolve this going forward." (Defs.' Mem. Supp. Summ. J. Ex. 8 (Theisen Depo. at 45 lines 6-9); see also id. Ex. 8 (Theisen Depo. at 46 lines 11-17).) Templeton remembered that employees were told that the company was "having some problems with cash flow but . . . trying to find some other financing and . . . thought that [it would] be able to work through the problem and if people

would be patient and bear with us, [it would] try and get everything worked out." (Pls.' Mem. Supp. Summ. J. Ex. 26 (Templeton Depo. at 21 lines 13-18).) Defendants did not, however, specifically disclose to employees that they had ceased the weekly transfer of employee contributions to Kanawha for payment of claims.

Throughout August, September, and the better half of October, Defendants proceeded with a business plan and worked with the bank to solve the company's financial problems. (Defs.' Mem. Supp. Summ. J. Ex. 5 (Templeton Depo. at 44 lines 7-23).) During this time, Defendants considered whether to terminate the Plan. To this end, Templeton stated that "Cliff [Theisen] . . . said that no, if we did that we'd lose all our employees and we'd have nothing, we'd be out in the cold . . . . because people want, half the people are working for insurance." (Pls.' Mem. Supp. Summ. J. Ex. 26 (Templeton Depo. at 25 lines 12-16, 18-20).)

Finally, in November, Saco Lowell management met with employees to tell them that "[Saco Lowell] didn't have the money to pay them, that everybody was on temporary layoff for the next week and that [they] would call them and let them know when checks would be ready and everything." (Id. Ex. 26 (Templeton Depo. at 23 lines 12-16).) With regard to the Plan, Templeton "remembers questions coming up about health care" and "Cliff said that we were doing everything we could to get [the health claims] paid at the time." (Id. Ex. 26 (Templeton Depo. at 23 lines 18-20).) On November 21, 2000, C.T. sent notice to its employees that the Plan was terminated effective November 28, 2000. (Id. Ex. 31.) C.T. did not provide any information about the status of costs or expenses incurred prior to the effective date of termination. Kanawha, however, had sent a letter to C.T.'s employees on November 7, 2000, "notifying [Plan beneficiaries] of C.T. . . . Group Health Benefits Plan's failure to provide

5

funds to allow us to release payment of these claims." (Id. Ex. 30.) The letter also stated: "We . . . have repeatedly requested funding for these claims from C.T. . . . [and] [o]ur requests have gone unanswered." (Id. Ex. 30.)

Plaintiffs are former employees of Saco Lowell who were participants in the Plan. Plaintiffs claim that Defendants breached their fiduciary duties under ERISA and seek damages in the amount of their unpaid Plan claims. Specifically, Plaintiffs contend Defendants violated their fiduciary duties by (1) failing to remit employee contributions to the Plan in an appropriate and timely manner and (2) failing to disclose to Plan participants that employee contributions were no longer being forwarded to the Plan in an appropriate and timely manner and that the Plan was insolvent. (Pls.' Mem. Supp. Summ. J. at 16-20 (alleging that Defendants failed to "safeguard the Plan's assets when it commingled employee contributions with the employer's funds in its general account," wrongfully "us[ed] employee contributions to pay payroll and other expenses from its general account," and failed to "pay employee deductions to the health plan on a weekly basis, regardless of whether it could fund the plan entirely," and that Defendants failed to "inform[] Plan Participants that the Medical Plan was insolvent," and that "the "Employer . . . ceased forwarding Employee contributions to the Plan").)

Defendants, on the other hand, argue that the undisputed evidence shows that Saco Lowell and C.T. timely remitted to Kanawha all employee contributions withheld from its employees' payroll for the payment of claims and administrative expenses under the Plan. (Defs.' Resp. Pls.' Mot. Summ. J. at 10.) In addition, Defendants contend that no evidence supports Plaintiffs' claims that Defendants breached their duty of disclosure with respect to the employee contributions and the Plan's financial difficulties. (Id. at 11-14.) Defendants also

6

move for summary judgment on Plaintiffs' breach of fiduciary claims, contending that ERISA does not afford Plaintiffs any relief for these alleged violations. Finally, in their complaint, Plaintiffs also seek money damages for unpaid wages. Defendants move for summary judgment on this ground as well.

For the reasons discussed in detail below, the court denies both parties' motions for summary judgment as to Plaintiffs' breach of fiduciary claims based on Defendants' failure to remit employee contributions to the Plan in an appropriate and timely manner and failure to disclose such conduct to Plan participants. The court, however, denies Plaintiffs' and grants Defendants' motion for summary judgment as to Plaintiffs' claims for unpaid wages and breach of fiduciary duty based on Defendants' failure to disclose that the Plan was insolvent.

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Moreover, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## B. Breach of Fiduciary Duty Claims

As an initial matter, Defendants argue that "[t]here is not a shred of evidence that, during the time period relevant to this matter, Saco Lowell had any discretion, authority, or control over the administration of the Medical Plan or over any of its assets." (Defs.' Mem. Supp. Summ. J. at 18.) Defendants also claim that C.T. was not "acting in its fiduciary capacity with respect to any of the acts of which Plaintiffs complain." (Id. at 20.)

Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) . . . has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C.A. § 1002(21)(A) (West 1999). "[T]he phrase 'to the extent' indicates that a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control." Licensed Div. Dist. No. 1 MEBA/NMU, AFL-CIO v. Defries, 943 F.2d 474, 477-78 (4th Cir. 1991) (internal quotation marks omitted). Certain positions, such as a plan administrator, render a person a fiduciary. See 29 C.F.R. § 2509.75-8 D-3.

8

The undisputed evidence shows that both Saco Lowell, through its corporate officers, and C.T., as Plan Administrator, exercised their discretionary authority during the relevant time period over the management of employee contributions to the Plan and the disclosure of necessary information under the Plan.  (Defs.' Mem. Supp.  Summ. J. Ex. 1 (Theisen Aff.); Ex. 3 (Templeton Aff.); Pls.' Mem. Supp. Summ. J. filed Nov. 24, 2003 Ex. 2; Pls.' Mem. Supp. Summ. J. Ex. 26 (Templeton Depo. at 18 lines 8-21; 23 lines 12-20; 25 lines 12-16, 18-20).)  For these reasons, the court finds Defendants' argument that Saco Lowell and C.T. were not fiduciaries without merit.

### 1.  Failure to Remit Employee Contributions in an Appropriate and Timely Manner Claim

Plaintiffs first claim that Defendants violated their fiduciary duties under ERISA by failing to remit employee contributions to the Plan in an appropriate and timely manner.  In particular, Plaintiffs contend that Defendants were obliged to hold all assets of an employee benefit welfare plan in trust and, accordingly, segregate employee contributions from any general account.  Furthermore, Plaintiffs allege that Defendants were required to remit employee contributions to Kanawha on payday and to refrain from using employee contributions to pay for payroll and other business expenses.

In response to Plaintiffs' allegations, Defendants contend that they were under no obligation to hold employee contributions in trust because the Plan is a "cafeteria plan" under 26 U.S.C.A. § 125 (West 2002 & Supp. 2005) and exempt from the statutory requirement that employee contributions be held in trust under 29 U.S.C.A. § 1103(a) (West 1999).  Further,

Defendants contend that, pursuant to its obligations, all employee contributions were timely remitted to Kanawha within 90 days as permitted under 29 C.F.R. § 2510.3-102(a) and (c).

In reply to these arguments, Plaintiffs dispute Defendants' contention that the Plan is a "cafeteria plan" as defined under § 125. Plaintiffs argue that the Plan "includes participants who are not employees (ie dependents)" and "does not offer 2 or more benefits." (Pls.' Mem. Opp. Defs.' Summ. J. at 6.) Plaintiffs also emphasize that Defendants were obligated to remit employee contributions to Kanawha "as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets" under 29 C.F.R. § 2510.3-102(a), which was payday.

As discussed in detail below, disputed issues of material fact remain as to whether Defendants were obligated to hold employees' contributions in trust. Therefore, Plaintiffs' and Defendants' motions for summary judgment on Plaintiffs' claim that Defendants breached their fiduciary duty under ERISA by failing to remit employee contributions in an appropriate and timely manner is denied.

**a. Should Defendants have maintained employee contributions to the Plan in trust?**

Generally, § 1103(a) requires that "all assets of an employee benefit plan . . . be held in trust by one or more trustees." 29 U.S.C.A. § 1103(a). Subsection (b) of § 1103, however, permits the Secretary to exempt certain plans from the requirements of § 1103(a). See id. § 1103(b)(4) ("The requirements of subsection (a) [of § 1103] shall not apply . . . to a plan which the Secretary exempts from the requirement of subsection (a) . . . ."). Among the plans exempt from the requirements set forth in § 1103(a) are "cafeteria plans" under § 125. See Announcement of Revised Enforcement Policy with Respect to Welfare Plans with Participant

Contributions, ERISA Technical Release No. 92-1, 57 Fed. Reg. 23272, 23273 (June 2, 1992) ("In the case of a cafeteria plan described in Section 125 of the Internal Revenue Code, the Department will not assert a violation in any enforcement proceeding solely because of a failure to hold participant contributions in trust."); see also Regulation Relating to Definition of "Plan Assets"--Participant Contributions, 61 Fed. Reg. 41220, 41222 (August 7, 1996) (affirming such rule is still in effect).

A cafeteria plan "means a written plan under which . . . all participants are employees, and . . . the participants may choose among 2 or more benefits consisting of cash and qualified benefits." 26 U.S.C.A. § 125(d)(1) (West 2002). Generally, "spouses and other beneficiaries of participants may not be participants in a cafeteria plan, [but] a plan may provide benefits to spouses and beneficiaries of participants." Tax Treatment of Cafeteria Plans, 49 Fed. Reg. 19321, 19323 (proposed May 7, 1984). Thus, so long as employees' dependents were not "participants" under the Plan, the Plan may still qualify as a cafeteria plan under § 125.

In addition, a plan that offers 2 or more benefits consisting of cash and qualified benefits offers employees "the opportunity to select . . . at least one taxable benefit and at least one nontaxable benefit." Id. at 19322.

> The term "taxable benefit" means cash, property, or other benefits attributable to employer contributions that are currently taxable to the participant under the Internal Revenue Code upon receipt by the participant. The term "nontaxable benefit" means any benefit attributable to employer contributions to the extent that such benefit is not currently taxable to the participant under the Internal Revenue Code upon receipt of the benefit. . . . The term "employer contributions" means amounts that have not been actually or constructively received (after taking section 125 into account) by the participant and have been specified in the plan document as available to a participant for the purpose of selecting or "purchasing" benefits under the plan.

Id. at 19323.

The parties have failed to submit the Plan in its entirety for the court's review.  (Compl. Ex. A (Plan Document missing pages 30-74); Pls.' Mem. Supp. Summ. J. Ex. 28 (Plan Document missing pages 1-69).)  Therefore, the court cannot conclusively ascertain the precise nature of the Plan.  The parties, furthermore, have failed to provide the court with any evidence from which it may determine whether employees' dependants were Plan "participants," or whether employees were required to choose between a taxable and nontaxable benefit under the Plan.  Plaintiffs' mere argument disavowing that the Plan is a cafeteria plan is insufficient grounds on which the court may grant summary judgment.  Templeton's statement, moreover, that "[e]mployees who participated in the . . . Plan would have their contributions to the . . . Plan deducted on a pretax basis through [another] Cafeteria Plan [provided by Defendants]" is insufficient to establish that the Plan satisfies the definition of a cafeteria plan provided under § 125 and, therefore, would be exempt from the trust requirements set forth in § 1103(a). (See Defs.' Mem. Supp. Summ. J. Ex. 3 (Templeton Aff. ¶ 6).)   Thus, a disputed issue of material fact remains as to whether Defendants breached their fiduciary duty by failing to hold employee contributions in trust.

### b.  Did Defendants timely remit employee contributions to the Plan?

If employee contributions to the Plan should have been held in trust, there is no dispute that Defendants improperly treated the employee contributions in violation of their fiduciary duties under ERISA.

Section 1103(a) requires that "all assets of an employee benefit plan shall be held in trust by one or more trustees."  29 U.S.C.A. § 1103(a) (West 2003) (emphasis added).  This

12

provision ensures that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."  29 U.S.C.A. § 1103(c)(1) (West Supp. 2005) (emphasis added); see also Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 23 (2004) ("The purpose of the anti-inurement provision [set forth in § 1103(c)], in common with ERISA's other fiduciary responsibility provisions, is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others.").

"[T]he assets of the plan include amounts . . . that a participant has withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets."  29 C.F.R. § 2510.3-102(a).  "[I]n no event shall the date [on which employee contributions become plan assets] occur later than 90 days from . . . the date on which such amounts would otherwise have been payable to the participant in cash (in the case of amounts withheld by an employer from a participant's wages)."  Id. § 2510.3-102(c); see also Regulation Relating to Definition of "Plan Assets"--Participant Contributions, 61 Fed. Reg. 41220, 41223 (August 7, 1996) (explaining that "[u]nder the final rule the outside limit for welfare benefit plans is . . . 90 days from the date of the employer's withholding or receipt of the participant contributions").

Plaintiffs were paid on a weekly basis and, likewise, their employee contributions would have also been withheld on a weekly basis.  Accordingly, under section 2510.3-102 (a) and (c), respectively, Plaintiffs' employee contributions became Plan assets "as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets," and

in "no event . . . later than 90 days from" each weekly payday.  Defendants correctly argue that

the evidence conclusively demonstrates that all employee contributions were remitted at least

within 90 days from any week of withholding.[2]  However, this evidence does not demonstrate

that Defendants satisfied their fiduciary obligations under section 2510.3-102.  See Definition of

Plan Assets–Participant Contributions, 61 Fed. Reg. at 41223 ("[T]he maximum period does

not operate as a safe harbor for . . . welfare benefit plans.  As a result, for many plans,

participant contributions will become plan assets well in advance of the applicable maximum

period.").

---

[2]Through July 11, 2000, all claims filed under the Plan were paid in full each week.
(Pls.' Mem. Supp. Summ. J. at 6.)  After that time, Saco Lowell next paid Kanawha on
August 14, 2000, in the amount of $15,693.72.  (Id. Ex. 25 (Kanawha Accounts Receivable
Detail Report).)  Between July 11 and August 14, 2000, employee contributions to the Plan
totaled $11,506.  (Id. Ex. 24 (Summary of Employee Contributions by week).)   With the
payment of $15,693.72 on August 14, 2000, therefore, Defendants remitted to Kanawha all
employee contributions made between July 11 and August 14, 2000, and did so within 90 days
from the date on which those contributions were withheld.
         Defendants next made a significant payment to Kanawha on October 4, 2000, in the
amount of $61,842.78.  (Id. Ex. 25 (Kanawha Accounts Receivable Detail Report).)  From
August 14 to October 4, 2000, employee contributions to the Plan amounted to $15,547.  (Id.
Ex. 24 (Summary of Employee Contributions by week).)  Defendants thus remitted to
Kanawha all employee contributions between August 14 and October 4, 2000, within 90 days
from the date on which those contributions were withheld.
         The Plan was terminated, effective November 28, 2000.  Defendants ceased
withholding employee contributions on November 5, 2000.  (Id. Exs. 24 (Summary of
Employee Contributions by week).)  Between October 4 and November 5, 2000, Defendants
withheld $10,751 in employee contributions.  On November 29, 2000, Defendants paid
Kanawha $70,116.26.  (Id. Ex. 25 (Kanawha Accounts Receivable Detail Report).)
Defendants thus remitted to Kanawha all employee contributions between October 4 and
November 5, 2000, within 90 days from the date on which those contributions were withheld.
         The court notes, as to its discussion above, that Defendants object to the court's
consideration of the Kanawha Accounts Receivable Detail Report, contending that the Report
is inadmissible hearsay.  Because the court's consideration of the Report supports Defendants'
argument in this respect, however, the court assumes, without deciding, that the Report is in
fact admissible evidence.

In fashioning the regulation under section 2510.3-102, the Department of Labor "intended to reflect a balancing of the costs of promptly transmitting such contributions to the plan relative to the protections provided to participants by such transfers." Definition of Plan Assets; Participant Contributions, 53 Fed. Reg. 17628, 17629 (May 17, 1988). "The regulation is not intended, however, to allow employers to use participant contributions for their own purposes." Id. "[P]articipant contributions [should] be paid promptly into the plan so as to begin earning interest or other investment return and to be available for the payment of benefits." Id. To this end, "employers who fail to transmit promptly such amounts, and plan fiduciaries who fail to collect those amounts in a timely manner, will violate the requirement that plan assets be held in trust; in addition, such employers and fiduciaries may be engaging in prohibited transactions." Id. See also Regulation Relating to Definition of "Plan Assets"–Participant Contributions, 61 Fed. Reg. at 41222 (stating that "if participant contributions to a welfare plan are not promptly devoted to benefits and expenses, the prudence and exclusive purpose requirements of ERISA may require that the contributions be invested").

The evidence in this case conclusively demonstrates that until mid-July 2000, Defendants remitted all employee contributions to the Plan on a weekly basis. After mid-July 2000, however, Defendants failed to do so. The Department of Labor states that "[i]t will not be reasonable if, absent changed circumstances, an employer which has been making biweekly remittances of such contributions hereafter changes its practices to hold such amounts in its own account for an additional period of time, up to the 90 day limit." Definition of Plan Assets; Participant Contributions, 53 Fed. Reg. at 17629.

15

The evidence in the record establishes that Defendants' change in practice directly contravened their fiduciary duties to the Plan.  Under ERISA, fiduciaries must take appropriate action with respect to employee contributions to the Plan and ensure that employee contributions inure to the benefit of the Plan.   When "it came down to paying payroll or paying the health claims," however, Defendants elected to pay payroll.  (Pls.' Mem. Supp. Summ. J. Ex. 26 (Templeton Depo. at 18 lines 20-21).)  Under these circumstances, there is no dispute that Defendants favored the interests of the Employer, C.T., over the interests of the Plan, in violation of their fiduciary obligations.  See Prof'l Helicopter Pilots Ass'n v. Denison, 804 F. Supp. 1447, 1453-54 (M.D. Ala. 1992) (finding employer, who also acted as fiduciary to ERISA Plan, breached fiduciary duties under ERISA for failing to deposit employees' paycheck contributions to the Plan); Pension Benefit Guar. Corp. v. Solmsen, 671 F. Supp. 938, 946 (E.D.N.Y. 1987) (same)).

In addition, Kawanha's alleged refusal to accept partial payment of claims does not justify Defendants' decision to use employee contributions for other matters until claims could be paid in full.  Kanawha's position did not prevent Defendants from remitting employee contributions to Kanawha's Claims Payment Account or some type of interest-bearing account on a weekly basis.  In this case, C.T., which appointed itself both Employer and Administrator of the Plan, and Saco Lowell served the interests of the employer rather than the Plan in determining what to do with employee contributions during times of financial difficulty. "ERISA . . . require[s], however, that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."  Pegram v. Herdrich, 530 U.S. 211, 225 (2000).  Consequently, Defendants acted in violation of their fiduciary duties to the Plan.

16

For the reasons discussed above, if Defendants were required to keep employee contributions in trust, there is no genuine issue of material fact that Defendants breached their fiduciary duty by failing to remit employee contributions to the Plan in a timely manner. However, because the evidence submitted on summary judgment is inadequate for the court to resolve whether Defendants were obligated to hold employees' contributions in trust, the court denies Plaintiffs' and Defendants' motions for summary judgment on this ground.

### 2.   Alleged Failure to Disclose Information About the Plan

Plaintiffs next argue that Defendants breached their fiduciary duties under ERISA by failing to provide Plan participants complete and accurate information regarding the Plan's financial status in the second half of 2000.  Specifically, Plaintiffs allege that Defendants failed to disclose to Plan participants that employee contributions were no longer being forwarded to the Plan in an appropriate and timely manner and that the Plan was insolvent.  For the reasons that follow, the court denies both parties' motions for summary judgment as to Plaintiffs' breach of fiduciary claim based on Defendants' failure to disclose that employee contributions were not remitted in an appropriate and timely manner to the Plan.  The court, however, denies Plaintiffs' and grants Defendants' motion for summary judgment as to Plaintiffs' claim for breach of fiduciary duty based on Defendants' failure to disclose that the Plan was insolvent.

"Congress intended ERISA's fiduciary responsibility provisions to codify the common law of trusts."  Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 380 (4th Cir. 2001). Under the common law of trusts, fiduciaries must maintain "an unyielding duty of loyalty to the beneficiary," and thereby refrain from making any material misrepresentations and, under certain circumstances, "affirmatively provide information to the beneficiary."  Id.  The "duty to

17

inform" arises in two specific instances. First, a fiduciary must provide "complete and accurate information as to the nature and amount of the trust property" upon the request of a beneficiary. Id. (internal quotation marks omitted). Second, a fiduciary must always "communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection." Id. (internal quotation marks omitted). "[T]he duty to inform [thus] entails not only a negative duty not to misinform but also an affirmative duty to inform when the trustee knows that the silence might be harmful." Id. (internal quotation marks omitted).

The record before the court conclusively demonstrates that, if Defendants were required to hold employee contributions in trust, Defendants breached their duty of loyalty to Plaintiffs by failing to inform them that employee contributions were being diverted and used for purposes other than the payment or administration of claims under the Plan. Naturally, the failure to forward employee contributions to the Plan on a timely basis is a material fact affecting the interests of Plan beneficiaries. By failing to remit employee contributions in a timely manner, Plan beneficiaries lost the opportunity to realize a certain amount of interest on their contributions or the immediate payment of benefits. In addition, Defendants either knew or should have known that Plaintiffs did not know of Defendants' failure to remit employee contributions in an appropriate and timely manner, and that Plaintiffs needed to know that fact for their protection. For these reasons, the court finds that, if Defendants were required to maintain employee contributions in trust, Defendants breached their duty to disclose under ERISA. See Griggs, 237 F.3d at 380.

18

As to Defendants' alleged duty to "inform[] Plan Participants that the Medical Plan was insolvent," the court finds that the evidence, even when viewed in the light most favorable to Plaintiffs, demonstrates that Defendants did not breach this duty.  In August, Saco Lowell management met formally with Plan beneficiaries to inform them of the Plan's financial problems.  (Defs.' Mem. Supp. Summ. J. Ex. 8 (Theisen Depo. at 45-49).)  At this meeting, and in other informal conversations with individual Plaintiffs, Theisen relayed that, with respect to the health plan, the company was not "currently meeting all [its] obligations" and "that the bank was controlling the purse strings [of the company]," but "hopefully, [the company] would be able to resolve this going forward."  (Id. Ex. 8 (Theisen Depo. at 45 lines 6-9); see also id. Ex. 8 (Theisen Depo. at 46 lines 11-17).)  Templeton testified that employees were told that the company was "having some problems with cash flow but . . . trying to find some other financing and . . . thought that [it would] be able to work through the problem and if people would be patient and bear with us, [it would] try and get everything worked out."  (Pls.' Mem. Supp. Summ. J. Ex. 26 (Templeton Depo. at 21 lines 13-18).)

Indeed, the undisputed evidence demonstrates that, until late October or early November, management at Saco Lowell maintained a reasonable belief that the company would survive financial difficulty and continue operations.  (Defs.' Mem. Supp. Summ. J. Ex. 8 (Theisen Depo. at 47 lines 2-12); see also id. Ex. 5 (Templeton Depo. at 44).)  Saco Lowell held various business contracts and prospects.  (Id. Ex. 5 (Templeton Depo. at 44); id. Ex. 8 (Theison Depo. at 47-49).)  In addition, Defendants attempted to work with the bank to ensure funding of Plan claims.  (Id. Ex. 5 (Templeton Depo. at 44); id. Ex. 8 (Theison Depo. at 47-49).)  During these months, Defendants remitted all employee contributions within 90 days of

19

any withholding and also provided additional monies necessary to pay some Plan claims in full. See supra footnote 3. Even in November 2000, when C.T. terminated the Plan, Defendants believed the sale of the company's assets would pay all outstanding Plan claims. (Defs.' Mem. Supp. Summ. J. Ex. 5 (Templeton Depo. at 47 lines 1-5, 49 lines 21-25.)

There is no evidence that Defendants' disclosure of information to the employees regarding the Plan's insolvency was either deficient or misleading in any way. Most importantly, Theisen revealed to employees that the company was having difficulty paying all outstanding claims and that the financial condition of the company was dire enough to cause the bank to take control of the company's accounts. Plan beneficiaries, therefore, were on notice that Plan benefits may not be timely paid or may not be paid at all. Accordingly, Defendants' disclosure of information regarding the Plan's financial difficulties was sufficient to provide beneficiaries the opportunity to seek out other health insurance or take a risk in proceeding with their coverage under the Plan. There is no evidence in the record, moreover, that Theisen's expression of hope that the company would remedy its financial problems was either unreasonable or inaccurate. Even in November 2000, when C.T. terminated the Plan, Defendants believed the sale of the company's assets would pay all outstanding Plan claims, and there is no evidence indicating that this belief was in violation of any fiduciary duty to the Plan. (Id. Ex. 5 (Templeton Depo. at 47 lines 1-5, 49 lines 21-25).)

Under these circumstances, there is no evidence establishing that, at the request of any beneficiary, Defendants' disclosure with respect to the Plan's insolvency was incomplete or inaccurate. Nor is there any evidence that Defendants knew of some material fact (that is, the Plan's insolvency) before or at the time of the Plan's termination and failed to disclose that fact

in disregard of the Plan beneficiaries' protection. For all the reasons discussed above, Plaintiffs' claim that Defendants failed to disclose necessary information about the Plan's insolvency cannot survive summary judgment. The court, therefore, grants summary judgment in favor of Defendants on this claim.

### 3. Remedy for Breach of Fiduciary Duty

Defendants also move for summary judgment on Plaintiffs' breach of fiduciary claims, arguing that Plaintiffs cannot receive any relief. Plaintiffs seek $125,343.77 in approved but unpaid medical and dental claims. Plaintiffs appear to seek this relief pursuant to both 29 U.S.C.A. §§ 1132(a)(2) and 1132(a)(3) (West 1999). Defendants claim that the relief Plaintiffs seek is unavailable under ERISA's remedial structure because the relief for breach of fiduciary duty under § 1132(a)(2) inures to the Plan itself, not its participants, and that any action under § 1132(a)(3) for "other appropriate equitable relief" does not permit a money judgment. For the reason provided below, to the extent Plaintiffs seek a monetary judgment in the amount of their unpaid medical and dental claims, the court grants Defendants' motion for summary judgment. Such relief is unavailable to Plaintiffs under ERISA.

ERISA is "a comprehensive and reticulated statute, the product of a decade of congressional study of the Nation's private employee benefit system." See Mertens v. Hewitt Assoc., 508 U.S. 248, 251 (1993) (internal quotation marks omitted). Courts should be "reluctant to tamper with [the] enforcement scheme embodied in the statute by extending remedies not specifically authorized by its text." See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209 (2002) (internal quotation marks omitted); see also Mid Atl. Med. Servs., LLC v. Sereboff, 407 F.3d 212, 217 (4th Cir. 2005) ("In disputes where [ERISA] does

not expressly authorize relief, the federal courts are not empowered to award it." (citing

Mertens v. Hewitt Assocs., 508 U.S. at 254 (emphasizing Court's "unwillingness to infer

causes of action in the ERISA context"))).

A participant, beneficiary, or fiduciary may bring an action "for appropriate relief

under section 1109." 29 U.S.C.A. § 1132(a)(2). Section 1109 imposes personal liability on

any fiduciary who breaches "any of the responsibilities, obligations, or duties imposed upon

fiduciaries" under ERISA. See 29 U.S.C.A. § 1109(a) (West 1999). For any breach under

§ 1109, a fiduciary is liable "to make good to such plan any losses to the plan . . . resulting

from such breach, . . . and shall be subject to such other equitable or remedial relief as the

court may deem appropriate." Id. The primary purpose of these provisions is to protect the

integrity of an ERISA plan. See Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134,

142-44 (1985). Section 1132(a)(2) permits a beneficiary to assert a civil action "for appropriate

relief under § 1109." 29 U.S.C.A. § 1132(a)(2). Any remedy sought under § 1132(a)(2),

however, must benefit the Plan as a whole, not any individual beneficiary. See Russell, 473

U.S. at 144 (finding that recovery under § 1132(a)(2) cannot be for individualized relief but

must be for relief that inures to the plan itself).

Plaintiffs' request to recover their individual unpaid claims under the Plan is not for the

benefit of the Plan as a whole and, therefore, § 1132(a)(2) cannot afford Plaintiffs relief. Even

if Plaintiffs' request for unpaid benefits could be fashioned as relief that inures to the benefit of

the Plan, Plaintiffs are still not entitled to relief under § 1132(a)(2). No evidence demonstrates

that such relief would "make good to such plan any losses to the plan . . . resulting from"

Defendants' alleged breach of fiduciary duty with respect to their failure to remit employee

contributions in a timely manner to the Plan or to disclose that employee contributions were no longer being remitted to the Plan in a timely manner.  29 U.S.C.A. § 1132(a)(2).  Nor does the court find that such relief would otherwise be appropriate or equitable under § 1132(a)(2).

In addition, Plaintiffs cannot recover their individual unpaid Plan claims under 29 U.S.C.A. § 1132(a)(3).  Section 1132(a)(3) allows a civil action to be brought:

> [B]y a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3) (emphasis added).  In Great-West, the Court explained that § 1132(a)(3) does not authorize all types of relief that a court of equity might award; it only authorizes those remedies "'that were typically available in equity.'"  534 U.S. at 210 (quoting Mertens, 508 U.S. at 256).  Legal remedies (such as money damages) were not typically allowed in equity.  See Mertens, 508 U.S. at 255 ("Money damages are, of course, the classic form of legal relief.").  Furthermore, "appropriate equitable relief" does not include all forms of relief formerly available in a court of equity because, in many circumstances, including those involving enforcement of a trust, a court of equity retained the power to fashion legal remedies "which would otherwise be beyond the scope of its authority."  See id. (internal quotation marks omitted).  To this end, the Court in Great-West found that equitable restitution is available, but that legal restitution is not under § 1132(a)(3).  See Great-West, 534 U.S. at 221.  The Court reasoned, "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  Id. at 214.

23

Plaintiffs' recovery of unpaid benefits under § 1132(a)(3) is therefore barred under the above authorities. Insofar as Plaintiffs seek this amount as compensatory damages for Defendants' failure to disclose certain information regarding the Plan, such relief is a legal remedy unavailable under § 1132(a)(3). To the extent that Plaintiffs seek unpaid claims as a form of restitution, this relief is not equitable as that term has been defined by the Court under Great-West. Plaintiffs do not allege that they seek to restore to them any property in Defendants' possession. For the reasons provided above, the court grants Defendants' motion for summary judgment insofar as Plaintiffs seek recovery of their approved yet unpaid Plan claims.

Pursuant to § 1132(a)(2), however, Plaintiffs, on behalf of the Plan, may be entitled to the interest that the Plan would have otherwise accrued on such contributions while held in trust by Defendants and before that amount was used to pay for approved claims. This relief will inure to the benefit of the Plan if Plaintiffs prove that Defendants breached their fiduciary obligation to the Plan by failing to remit employee contributions or to disclose that employee contributions were not being remitted to the Plan in a timely manner. When and if Defendants' liability is established, the court will order Defendants to make good to the Plan the interest which the Plan would have otherwise accrued and require Defendants, as trustees of the Plan, to allocate that amount to any approved, yet unpaid claims.

## C. Unpaid Wages

Defendants also move for summary judgment on Plaintiffs' unpaid wages claim. Specifically, Defendants assert that because Plaintiffs were laid off, they did not qualify to be paid for any unpaid vacation or sick time. (Defs.' Mem. Supp. Summ. J. Ex. 3 (Templeton

24

Aff. ¶ 14-17).)  Plaintiffs point to no specific evidence in response.  Therefore, the court grants Defendants' motion for summary judgment on this claim.

Therefore, it is

**ORDERED** that Defendants' motion for summary judgment, Document number 89, is granted in part and denied in part.  Specifically, the court grants Defendants' motion for summary judgment as to Plaintiffs' unpaid wages claim and breach of fiduciary duty claim with respect to Defendants' alleged failure to disclose the insolvency of the Plan.  The court denies Defendants' motion for summary judgment as to Plaintiffs' breach of fiduciary duty claims based on Defendants' failure to remit employee contributions in a timely manner or to disclose that employee contributions were not being remitted in a timely manner.  It is further

**ORDERED** that Plaintiffs' motion for summary judgment, Document number 92, is denied.  It is further

**ORDERED** that the parties shall have until August 19, 2005, to address by motion whether the Plan was a cafeteria plan as defined under 26 U.S.C.A. § 125(d)(1) (West 2002).

**IT IS SO ORDERED.**

s/ Henry M. Herlong, Jr.
United States District Judge

Greenville, South Carolina
August 10, 2005